# United States Court of Appeals
## For the First Circuit

No. 05-2272

JOHN EVANS,

Petitioner, Appellant,

v.

PAUL VERDINI,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Emanuel Howard for petitioner.
Susanne G. Reardon, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, was on brief, for respondent.

October 18, 2006

**LYNCH**, **Circuit Judge**. John Evans was convicted in Massachusetts state court of the first-degree murder of Lyle Jackson and was sentenced to life in prison. His conviction was affirmed by the Massachusetts Supreme Judicial Court (SJC). See Commonwealth v. Evans, 786 N.E.2d 375, 380 (Mass. 2003). His subsequent petition in federal district court for a writ of habeas corpus was denied. See Evans v. Verdini, No. Civ.A. 04-10323, 2005 WL 1638119, at *3 (D. Mass. Jul. 13, 2005).

Evans appeals from that denial. He argues that the exclusion of certain defense witness testimony concerning a recanted prior statement violated his Sixth Amendment right to present a defense. He also argues that the state prosecutor violated the rule that a prosecutor may not impeach his own witness as a ploy for the introduction of inadmissible evidence, and that this violated his Sixth Amendment Confrontation Clause rights. These arguments cause us to explore the topic of impeachment and recanted statements.

We reject Evans's claims and affirm the district court's denial of the petition.

I.

We briefly recount the facts as recited in detail in Commonwealth v. Evans, 786 N.E.2d at 381.

In the early morning of January 25, 1995, Jackson and his friend, Marcello Holliday, were at Cortee's, a nightclub in the

-2-

Dorchester area of Boston.  Evans also was at Cortee's with his brother Jimmy Evans (Jimmy) and two friends, Robert Brown and Ronald Tinsley.  Around 1:45 a.m., Jackson and Holliday left Cortee's for Walaikum's, a nearby restaurant.  They arrived at approximately 2:20 a.m.  About fifteen minutes later, Evans, his brother, Brown, and Tinsley entered Walaikum's, then crowded with customers.  Evans, Jimmy, Brown, and Tinsley left after a minute or so, but quickly reentered the restaurant.  Tinsley began talking with a young woman, and Brown said to Evans and Jimmy, "That's one of them right there."  After verifying that Brown was referring to Jackson, Jimmy drew a gun and approached Jackson, who backed away, stumbled, crawled into a corner, and began begging for his life.  Jimmy then shot at Jackson four or five times.  After seeing Jimmy shoot at Jackson, Willy Wiggins, who owned Walaikum's, went to the back of the restaurant and called the police.

Alton Clarke, another customer, tried to leave the restaurant and was confronted by Evans, who also was armed with a handgun.  Evans allowed Clarke to leave once he stated that he had nothing to do with Jackson.  Evans then approached Jackson and shot at him once.

Evans, Jimmy, Brown, and Tinsley left Walaikum's, and a car chase ensued.  All four were apprehended by police after they turned into a dead-end street and tried to flee on foot.

Jackson died from an infection related to his gunshot wounds. He had been shot three times.

The Evans brothers, Brown, and Tinsley were charged with murder by joint venture and tried together before a jury. At trial, the government introduced the testimony of Marvette Neal, who knew Jackson, Evans, and Jimmy. Neal had told police approximately two weeks after the shooting that he had seen both Evans and his brother shoot at Jackson in Walaikum's. Later that month, however, when he testified before the grand jury considering the charges against Evans, Neal stated only that he had seen Evans and Jimmy inside Cortee's and Walaikum's. By the time of Evans's trial, in the fall of 1996, Neal had backed further away from his initial statement. During voir dire, Neal stated that he could recall no more than that he had seen Jackson at Cortee's and Walaikum's. He testified that he did not remember making his prior statement to police, that he did not see Evans or Jimmy shoot Jackson, and that he did not tell police anything to that effect.

After voir dire, the prosecution proceeded with Neal as a witness; Neal testified before the jury that he could not recall having seen Evans or Jimmy at Cortee's or Walaikum's on the night in question. The trial judge, over objection, permitted the government to introduce Neal's grand jury testimony to the contrary as substantive evidence. The government also was permitted, again

over objection, to lay a foundation to impeach Neal with his prior inconsistent statement to the police.

The defense then cross-examined Neal. In particular, Evans's counsel asked Neal whether he had seen Evans or his brother with a gun on the night of the shooting. Neal testified that he had not.

The next day, the government called Detective Kenneth Dorch, who had taken Neal's initial statement. Detective Dorch testified to Neal's prior inconsistent statement -- that is, that Neal had told him that he had seen Evans shoot at Jackson. The trial judge instructed the jury six times during Detective Dorch's testimony that the prior statement was admitted only for the purpose of impeachment and was not to be considered substantive evidence.

During his defense case, Evans sought to introduce the testimony of Eddie Hawkins, who had shared a jail cell with Tinsley after the shooting. Hawkins had made a pre-trial statement to police that Tinsley, while in jail, had admitted to shooting Jackson and had acknowledged that he had intended to accept a plea bargain until he learned that the Commonwealth could place him only in the getaway car and not in Walaikum's. However, during voir dire Hawkins repudiated his prior statement about Tinsley's confession and stated that he had fabricated the story of the

confession[1] to gain more favorable treatment in his own pending case.  As a result of Hawkins's voir dire testimony, the trial judge ruled that Evans's attorney could not question Hawkins about his conversation with Tinsley other than to ask whether they had discussed the pending charges against Tinsley.  Evans then opted not to call Hawkins.

On November 8, 1996, Evans was convicted of first-degree murder on theories of deliberate premeditation and extreme atrocity and cruelty.[2]  He also was found guilty of two charges of illegally possessing ammunition, one charge of illegally discharging a firearm within five hundred feet of a building, two charges of illegally possessing a firearm, two charges of assault and battery with a dangerous weapon, and various motor vehicle charges.  The trial judge sentenced Evans to a mandatory term of life imprisonment on the murder conviction, and to concurrent terms of four to five years for the illegal possession of a firearm and assault and battery convictions.  The other convictions were placed on file with Evans's consent.

Evans filed a timely notice of appeal and a motion for a new trial.  The motion for a new trial was denied, and Evans

---

[1]    Hawkins did not recant his statements about Tinsley's having changed his mind about accepting a plea bargain.

[2]    Jimmy also was convicted.  Brown and Tinsley were acquitted.

appealed. His direct appeal to the SJC was consolidated with his appeal from the denial of his motion for a new trial. The SJC affirmed the convictions and the denial of the motion for a new trial. Evans, 786 N.E.2d at 380. Evans then filed a habeas petition in federal district court. The petition was denied. See Evans, 2005 WL 1638119, at *3. A certificate of appealability was granted as to two issues.

## II.

Review of the district court's denial of habeas relief is de novo. Norton v. Spencer, 351 F.3d 1, 4 (1st Cir. 2003). To state a federal habeas claim concerning a state criminal conviction, the petitioner must allege errors that violate the Constitution, laws, or treaties of the United States. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also 28 U.S.C. §§ 2241(c)(3), 2254(a). "[F]ederal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

Federal habeas review of the state court's decision is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. Under AEDPA, habeas relief is unavailable on federal claims "adjudicated on the merits in State court proceedings" unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Under our circuit law, federal claims "raised before the state court but . . . left unresolved" are reviewed de novo.  Lynch v. Ficco, 438 F.3d 35, 44 (1st Cir. 2006) (quoting Horton v. Allen, 370 F.3d 75, 80 (1st Cir. 2004)) (internal quotation marks omitted); accord Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) ("AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address.").

III.

A.      Challenges Based on the Rule that a Prosecutor Cannot Impeach His Own Witness as a Pretext for Placing Inadmissible Evidence Before the Jury

We start with Evans's strongest claim.  Evans's habeas petition makes three arguments related to Neal.  Taking the fact that Neal's voir dire testimony showed that he would testify that he recalled essentially nothing of importance to the prosecutor, Evans argues (1) Neal himself should never have been allowed to testify, (2) Neal's grand jury testimony that he had seen Evans at Walaikum's should not have been admitted, and (3) Detective Dorch should not have been allowed to testify that Neal had told the police that he (Neal) had seen Evans and his brother shoot Jackson

-8-

at Walaikum's. Evans asserts that his rights under the Confrontation Clause were violated.

Violation of a rule of evidence does not itself amount to a constitutional violation, which is a necessary predicate for a habeas claim. Kater v. Maloney, 459 F.3d 56, 64 (1st Cir. 2006). Still, on the facts of a given case, an evidentiary error may result in such fundamental unfairness to the defendant as to constitute a due process violation. See, e.g., Chambers v. Mississippi, 410 U.S. 284 (1973).

Another necessary predicate for habeas relief is that the claims presented in the federal habeas case have first been presented to the state court. See 28 U.S.C. § 2254(b), (c); Picard v. Connor, 404 U.S. 270, 275 (1971). The first argument -- that Neal should not have been allowed to testify at all after his voir dire disclaimer of his prior statements -- was not presented to the SJC and so is not before us.

The second argument -- that the grand jury minutes should not have been admitted -- was presented to the SJC. The SJC agreed with Evans that those minutes did not meet the requirements of the past recollection recorded exception to the hearsay rule. Evans, 786 N.E.2d at 382-83. It also held that the evidence was not substantively admissible under a state law rule pertaining to falsely testifying about a lack of memory because there was no finding by the trial judge that the claimed lack of memory was

-9-

fabricated. Id. at 383. The SJC held, nonetheless, that the error in admitting the grand jury testimony was harmless, given that the defendants and another witness had testified that Evans was at Walaikum's on the night in question. Id. This ruling was unassailable, and habeas relief thus is not warranted. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (holding that a petitioner is entitled to habeas relief on the basis of a trial error only if that error "'had [a] substantial and injurious effect or influence in determining the jury's verdict'" (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946))); see also Petrillo v. O'Neill, 428 F.3d 41, 44-45 (1st Cir. 2005) (applying Brecht post-AEDPA).

The most significant of Evans's claims, at least in theory, is the third: that the prosecution engaged in a subterfuge to get into evidence Neal's prior statement to the police that he had seen Evans shoot at Jackson. The prosecution had no other witness who said as much, and the defendant testified that he had not shot Jackson.

Evans's best arguments are grounded in the line of cases holding that "a criminal prosecutor may not employ a prior inconsistent statement to impeach a witness on a 'mere subterfuge' or for the 'primary purpose' of placing before the jury substantive evidence which is otherwise inadmissible." 1 Broun et al., McCormick on Evidence § 38, at 168 (6th ed. 2006) (emphasis omitted). Of course, there is no general prohibition in the

-10-

Constitution on a party impeaching its own witness. Cf. Fed. R. Evid. 607; Mass. Gen. Laws ch. 233, § 23. In criminal cases, however, such impeachment may trigger Due Process and Confrontation Clause concerns.

This rule imposing constraints on prosecutors is widely accepted. See, e.g., United States v. Gilbert, 57 F.3d 709, 711 (9th Cir. 1995) ("'[T]he government must not knowingly elicit testimony from a witness in order to impeach him with otherwise inadmissible testimony.'" (quoting United States v. Gomez-Gallardo, 915 F.2d 553, 555 (9th Cir. 1990))); United States v. Patterson, 23 F.3d 1239, 1245 (7th Cir. 1994) ("[T]he prosecution may not 'call a witness that it [knows will] not give it useful evidence, just so it [can] introduce hearsay evidence against the defendant in the hope that the jury [will] miss the subtle distinction between impeachment and substantive evidence." (second and third alterations in original) (quoting United States v. Webster, 734 F.2d 1191, 1192 (7th Cir. 1984))); United States v. Morlang, 531 F.2d 183, 189 (4th Cir. 1975) (stating that the government must not, "in the name of impeachment, . . . present testimony to the jury by indirection which would not otherwise be admissible").

The rule has several components, usually articulated as requiring a showing of "mere subterfuge" or "primary purpose" by the prosecutor in eliciting the testimony. Those requirements, in

turn, lead to further inquiry. Application of the "mere subterfuge" or "primary purpose" doctrine focuses on the entire content of the witness's testimony, not just the challenged statement. If the testimony as a whole is useful on any fact of consequence, then the witness may be impeached on any other matter testified to by means of a prior inconsistent statement. 1 Broun et al., supra, § 38, at 168-69; accord United States v. Kane, 944 F.2d 1406, 1412 (7th Cir. 1991) ("When a government witness provides evidence both helpful and harmful to the prosecution, the government should not be forced to choose between the Scylla of foregoing impeachment and the Charybdis of not calling the witness at all."). The claim here is that Neal's testimony was not useful to the prosecutor on any matter of consequence, and that Neal was called as a subterfuge to get into evidence his prior hearsay statement.

There is an initial question of whether this claim, which was presented to the SJC, was presented as a matter of federal constitutional law. The Commonwealth concedes that this exhaustion question is very close and difficult. We bypass this issue because it is clear Evans would fail on this claim, even if it had been presented in constitutional terms to the SJC and even if we gave no deference to the SJC's decision. See Fortini, 257 F.3d at 47.

As the SJC noted, Evans's argument has some initial appeal, but it ignores one important fact. See Evans, 786 N.E.2d

-12-

at 384.  Our turning point (as was the SJC's) is that it was the defense's cross examination of Neal, not the Commonwealth's direct examination, that created the basis for the admission into evidence of Neal's prior inconsistent statement.  It was defense counsel who, on cross examination, asked Neal if he had ever seen Evans with a gun in his hand on January 24 or 25.  When Neal said he had not, the door was open for the prosecution to impeach Neal's testimony with his statement to Detective Dorch that he had seen Evans shoot Jackson.  There was no violation of the rules of evidence, much less a violation of constitutional rights.[3]

B.      Challenge Based on the Exclusion of Hawkins's Testimony

Evans's second argument is that he should have been permitted to question Hawkins about his earlier conversation with Tinsley, which the trial court excluded.  He argues that because Hawkins's prior statement to the police (that Tinsley had confessed) supported the defense's theory of the case (that Tinsley, not Evans, had been the second shooter), defense counsel should have been permitted to question Hawkins about the portion of the conversation concerning Tinsley's supposed confession and to impeach Hawkins with his prior statement to the police.[4]  Evans

_____

[3]     Evans argues that his counsel was required, as a zealous advocate, to cross-examine Neal.  Because Neal offered no testimony of any value to the prosecution, however, this argument is without merit.

[4]     Evans also contests the exclusion of those parts of Hawkins's reported conversation with Tinsley that Hawkins did not

-13-

argues that in limiting Hawkins's testimony by precluding questions about the confession,[5] the trial judge violated his (Evans's) Sixth Amendment compulsory process rights.

The question was presented to and ruled on by the SJC. The SJC ruled that the trial judge could have properly concluded, based on Hawkins's voir dire, that Hawkins would offer no relevant testimony if called. Id. at 385. In addition, it held that Hawkins's prior statement was inadmissible hearsay, and that Evans had not shown it to be inconsistent with any relevant testimony that Hawkins would have given. Id. Moreover, the SJC ruled that the defense was not permitted to call Hawkins just so it could impeach him with an otherwise inadmissible prior statement. Id. Finally, the SJC held that given Hawkins's repudiation of his prior statement, it was hardly apparent that the statement, although hearsay, was so reliable and trustworthy that its exclusion interfered with Evans's constitutional right to present a defense. Id. Our inquiry is whether the SJC's conclusions involved an

---

repudiate (that is, that Tinsley was planning to enter into a plea bargain until he realized that the police might be unable to place him at the scene). Any error with respect to the exclusion of such testimony was harmless. See Brecht, 507 U.S. at 637-38.

[5] To be clear, the court permitted Evans to call Hawkins but precluded questions about the conversation with Tinsley other than to say that a conversation had occurred. Evans then decided not to call Hawkins. As the astute federal habeas judge pointed out, Hawkins was permitted to testify, but not about a statement he had just sworn was untrue. See Evans, 2005 WL 1638119, at *2.

unreasonable application of clearly established federal law as interpreted by the Supreme Court. 28 U.S.C. § 2254(d).

"A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998); see also Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); Rock v. Arkansas, 483 U.S. 44, 55 (1987) ("Of course, the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" (quoting Chambers, 410 U.S. at 295)). As long as they are not "arbitrary or disproportionate to the purposes they are designed to serve," limitations on the admissibility of evidence do not violate a defendant's right to present a defense. Rock, 483 U.S. at 56; see also Scheffer, 523 U.S. at 308. Hawkins's prior statement was hearsay not within any exception and was therefore not independently admissible. See Commonwealth v. Semedo, 665 N.E.2d 638, 646 (Mass. 1996).

Evans argues that even if the prior statement was not substantively admissible, he should have been permitted to use it for impeachment purposes. He argues that it was particularly unfair to exclude Hawkins's testimony after he had recanted, but to

-15-

permit Neal, who also had recanted, to testify. Moreover, Evans emphasizes that although it was the prosecution that sought to present Neal's prior statement, here it was the defendant who sought to impeach Hawkins, and that denying him the opportunity to do so impaired his Sixth Amendment right to present a defense.[6] In theory at least, a defendant may have a viable claim that "applying the rule [against impeachment of one's own witness] to prevent him from mounting a critical attack on a key defense witness is unconstitutional." 1 Broun et al., supra, § 39, at 169; see Imwinkelried & Garland, Exculpatory Evidence: The Accused's Constitutional Right To Introduce Favorable Evidence § 8-2, at 260-61 (3d ed. 2004).

There are material differences between the two situations, however, apart from the fact that the prior inconsistent statement by Neal came in because the defense opened the door. There was a difference in the reliability of the two statements. Hawkins was not a first-hand witness to the shooting, but purported to repeat a statement by Tinsley that confessed that

_____

    [6]    Massachusetts seems to have adopted a broader rule that no party (not just prosecutors) has a statutory right "to call a witness whom he knows beforehand will offer no testimony relevant to an issue at trial solely for the purpose of impeaching that witness with prior inconsistent statements that would otherwise be inadmissible." Commonwealth v. McAfee, 722 N.E.2d 1, 8 (Mass. 1999). Our concern is only whether this state evidentiary rule as applied to Hawkins constituted a deprivation of federal constitutional rights so as to render the SJC's opinion an unreasonable application of the pertinent law.

-16-

Tinsley had shot Jackson. Hawkins then told the trial judge on voir dire that Tinsley had never made a confession. Hawkins said he made up the whole thing in order to curry favor with the police.[7] By contrast, Neal's recantation by loss of memory could easily be taken as a fabrication.

As the SJC held, the state trial judge correctly found that the recently recanted prior statement was not "so reliable and trustworthy that, although hearsay, its exclusion might offend [Evans's] constitutional right to present a defense." Evans, 786 N.E.2d at 385. The SJC's holding was not an unreasonable application of law for habeas purposes.

The dismissal of the petition for habeas corpus is affirmed.

---

[7] "The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." Chambers, 410 U.S. at 298.